## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:15-cr-00073-1 |
| | ) | 2:16-cr-00133 |
| v. | ) | |
| | ) | Chief Judge Mark R. Hornak |
| RYAN ANDREW GUSTAFSON, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION

**Mark R. Hornak, Chief District Judge**

AND NOW, this 20th day of August, 2020, the Court issues the following Order: Ryan Andrew Gustafson ("the Defendant") filed Motions for Release/Reduced Sentence at ECF No. 574 in Case No. 15-cr-00073-1 ("case '73") and ECF No. 162 in Case No. 16-cr-00133 ("case '133") seeking compassionate release in this case. For the reasons set forth, the Defendant's Motions are GRANTED.

### I.   PROCEDURAL POSTURE

On March 21, 2019, the Defendant pleaded guilty to money laundering, conspiracy, and counterfeiting charges related to the Defendant's scheme to manufacture counterfeit Federal Reserve Notes in Uganda and distribute them to the United States using the Dark Net. (Case No. 16-cr-00133, PSR, ECF No. 152, ¶¶ 4, 5, 10.) In case '73, the Court sentenced the Defendant to a term of imprisonment of sixty (60) months at count one for conspiracy in violation of 18 U.S.C. § 371 and seventy-four (74) months at count two for conspiracy to launder money in violation of 18 U.S.C. § 1956(h). (Case No. 15-cr-00073, ECF No. 564, at 2.) The Court also imposed sixty (60) months imprisonment at count two in case '133 for committing counterfeiting acts outside of the United States in violation of 18 U.S.C. § 470. (Case No. 16-cr-00133, ECF No. 162, at 2.)

Those sentences were all set to run concurrently. The Parties agree that the Defendant is eligible for placement into a Residential Reentry Management Center ("halfway house" or "RRC") in Texas in September, 2020. As of this Order, the Bureau of Prisons ("BOP") lists the Defendant's full release date as March 7, 2021.

Now, the Defendant moves for release under 18 U.S.C. § 3582(c)(1)(A)(i), providing in his first-arriving *pro se* motion several "extraordinary and compelling reasons" for release. (ECF No. 574.)[1] First, he argues that his health conditions in light of the COVID-19 pandemic arise to the "extraordinary and compelling" level. Those conditions include recurrent respiratory issues and hypothyroidism. (*Id.* at 10–11.) The Defendant's medical records also show that he has tested positive for the presence of hepatitis B infection, although he is currently asymptomatic. (ECF No. 586-1, at 85.) Second, he argues that the operations at his prison facility—FCI Jesup (GA)—have been so disrupted by COVID-19 that it merits his early release. (ECF No. 574, at 14.) Namely, "that his inability to receive medical treatment, exercise, proper diet, participate in productive programming activities as outlined in the First Step Act, receive visitations from loved ones, and otherwise function in a humane environment" arises to an "extraordinary and compelling" level. (*Id.*) Third, through his now-counseled motion, in addition to the above-discussed factors, the Defendant asserts that his family's destitution and the fact that his daughter no longer has a caregiver able to support her is a "family circumstance" warranting compassionate release. (ECF No. 581, at 5.) The Defendant also asserts that some combination of reasons[2] arise to the

---

[1] The parties filed the relevant papers simultaneously in both cases. Hereinafter, apart from the noted exception below, the Court will refer only to the ECF numbers in Case No. 15-cr-00073.

[2] He argues: "[i]n combination, the existence of the virus, the concrete risk that it will spread through the satellite camp at Jesup given its recent enhanced spread in Wayne County[, GA] alone, Mr. Gustafson's physical vulnerability to the virus based upon at least two conditions revealed by bloodwork performed at the BOP facility, the desperate circumstances of his family, whose ties have been loosened by financial difficulties and limits placed on travel, and, indeed the need for medical treatment for conditions that had not been heretofore diagnosed, cry out for a "compassionate release" remedy." (ECF No. 595, at 12.)

"extraordinary and compelling" level under the "Other Reasons" catch-all in Application Note 1(D) of U.S.S.G. § 1B1.13. (ECF No. 595, at 12.)

The Government responds that the Defendant's Motion, insofar as it is based on his medical conditions, must be dismissed because he failed to meet the exhaustion requirement in Section 3582. (ECF No. 585, at 1.) It further argues that the Defendant's health conditions do not rise to the "extraordinary and compelling" level in any case. (*Id.* at 2.) The Government also argues that the Defendant's family circumstances are insufficient because his daughter's caregiver has not been "incapacitated," as outlined in the Sentencing Guidelines § 1B1.13. (*Id.* at 3.)

## II.   **DISCUSSION**

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) ("A federal court generally may not modify a term of imprisonment once it has been imposed."). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. Under that provision, a court may modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In addition, the reviewing court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they apply; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id.*

Here, the Court concludes that the Defendant's Motions are properly before it, and that on the record before the Court, the Defendant's health conditions do rise to an "extraordinary and compelling" level. The Court also concludes that the factors the Court must also consider do not

outweigh its conclusion that the Defendant should be released under the terms set out below. For these reasons, the Court will grant the Defendant's Motions.

### A.  <u>Administrative Exhaustion</u>

To consider the merits of the Defendant's Motion, the Court must first determine that he has complied with § 3582(c)(1)(A)'s exhaustion requirement. Before the enactment of the First Step Act, only the Director of the BOP could file a motion for compassionate release. The First Step Act, however, amended § 3582 to permit an inmate to file a motion in federal court seeking compassionate release, but only after fully exhausting "all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). In other words, a defendant must first file a request for compassionate release with the warden of their facility and then either: (1) fully exhaust BOP's administrative remedies; or (2) wait thirty (30) days from the date their initial request was filed with the warden.

The Government does not dispute that the Defendant has complied with the exhaustion requirement as to his "family circumstances" argument. (ECF No. 585, at 12.) However, it argues that the Defendant has not met the exhaustion requirement with respect to his health concerns. (*Id.* at 9.) The Government posits that the Defendant did not actually exhaust his administrative obligations because when he submitted an email to the Warden of FCI Jesup on March 27, 2020, referencing his health status in the "chronic care" unit and the risks to his health from the COVID-19 virus, the Warden responded with , "Please see your unit team for further guidance." (ECF No. 574-2.) That was the entirety of the Warden's response.

Notwithstanding the Warden's rather empty reply, the Government argues that it is the Defendant's notice to the Warden that suffers from several defects. First, it argues that the

Defendant's email raised only generalized concerns about COVID-19, rather than any specific health concerns, which "deprived the BOP" of the chance "to review the matter in the first instance," as would be consistent with, the Government says, the policy justification of exhaustion. (ECF Nos. 585, at 9; 596, at 3.) Second, it argues that the nature of the correspondence would lead any "reasonable person" to conclude that the Warden wanted the Defendant to seek more information from the "unit team" and then submit a new request based on that information. (ECF Nos. 585, at 9.) The Defendant responds that his emailed request to the Warden, although "sparse," meets the requirements of § 3582(c)(1)(A), which he argues do not "demand that an inmate . . . work through levels of authority within the facility before reaching the warden [or] . . . that an inmate adhere to any particular form or format in order to achieve that communication." (ECF No. 594, at 3.) The Defendant further argues that the BOP was well aware of his medical conditions at the time he sent his request to the Warden given his "chronic care" medical care status at FCI Jesup. (*Id.*)

The Court concludes that the Defendant has met the exhaustion requirements such that it may consider his Motions in their entirety. First, while the Government is correct that the Defendant did not highlight any specific health conditions in his email to the Warden, the Defendant did draw attention to his own health conditions in light of COVID-19. In particular, he notes that he is "in the chronic care program" and seeks home confinement "in order to protect" him from "the COVID-19 crisis." (ECF No. 574-2, at 2.) Facially, based upon the Defendant's email, the BOP cannot be said to be unaware of the medical basis for which he sought a reduction in sentence. Second, the Government's reading of the exhaustion requirement in the context of this case is strained. As the Government notes, the Court of Appeals for the Third Circuit has ruled that the exhaustion requirement is a "glaring roadblock" that requires "strict compliance." *United*

*States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). However, that "roadblock" goes only as far as the statute, which requires "the lapse of 30 days from the receipt of such **a request** by the Warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). The Defendant's email, received by the Warden well over thirty (30) days ago, plainly "request[s] recommendation for reduction in sentence pursuant to 18 U.S.C. 3582(c)(1)(A) . . . in order to protect [him] from Extraordinary [sic] circumstances . . . [t]he circumstance is the COVID-19 crisis." (ECF No. 574-2, at 2.) As discussed, the Defendant alludes to his health issues as well. (*Id.* ("I'm in the chronic care program").) There is no reason to conclude that the mode of the Defendant's communication (email) or the equivocal, or more precisely rather empty, response by the Warden constitute a failure to exhaust by the Defendant. *See United States v. Fowler*, No. 17-CR-00412-VC-1, --- F. Supp. 3d ----, 2020 WL 3034714, at *1 (N.D. Cal. June 6, 2020) (liberally construing a defendant's email to the warden asking to be placed on home confinement as a request for compassionate release under § 3582).

Further, there is nothing in the statute that contemplates or permits the Warden to in essence subcontract his statutory obligations to the "unit team" or that would permit the Warden to add an additional layer of internal exhaustion to the process. And here, the response by the Warden was devoid of any direction to either the Defendant or the "unit team" as to what they were to do if they were in contact. Thus, either the response by the Warden was tantamount to a denial, or it was a "nothing" in terms of a response, and with far more than thirty (30) days having now elapsed since the Defendant's submission to the Warden, the matter is properly before the Court. *See e.g.*, *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (rejecting the argument that a defendant is required to completely exhaust the administrative remedy process if the warden denies a defendant's request within thirty (30) days of receiving it, primarily because "the statute states

that the defendant may file the motion [before a district court] thirty days after the warden receives his request"). Accordingly, the Court concludes that the Defendant has met the exhaustion requirement with respect to his request for compassionate release based on his medical issues.

### B. "Extraordinary and Compelling" Medical Reasons

Next, the Court must determine whether the Defendant has medical conditions that present an "extraordinary and compelling" reason that warrants release under § 3582(c)(1)(A)(i). While the relevant provisions of the Sentencing Guidelines predate the passage of the applicable provisions of the First Step Act, and would be advisory in any event, they do provide some benchmarks for the Court's consideration. The Application Notes to § 1B1.13 of the Guidelines speak to this particular requirement and outline two (2) different medical conditions that can rise to an "extraordinary and compelling" level: (1) terminal illnesses; and (2) non-terminal conditions that substantially diminish the ability of the defendant to provide self-care within the correctional environment.

The Defendant does not allege he suffers from any terminal illness, as that term is defined.[3] Rather, he argues that he is at high risk of severe medical complications were he to be afflicted with COVID-19 arising from respiratory issues, hypothyroidism, and hepatitis B. (ECF Nos. 574, at 10; 595, at 11.) The Defendant also proffered a report from Michael Smith, M.D., an emergency medicine doctor, which states that the Defendant's conditions, especially his hepatitis B, "highly suggest" that the Defendant is at high risk of severe complications if he is infected with COVID-19. (ECF No. 586, at 7.) For its part, the Government argues that the Defendant's conditions are

---

[3] *See* U.S.S.G. § 1B1.13, cmt. n.1(A)(i) ("the defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.").

not higher risk factors for COVID-19. (ECF No. 596, at 7–13.) The Government also challenges the conclusions of the expert medical report, citing Dr. Smith's lack of access to a Ugandan chest x-ray report and to what it says are other admissibility and credibility issues with the evidence upon which he based his conclusions. (*Id.*)

The Court also heard testimony at the hearing on these Motions from Dr. Smith. At the hearing, Dr. Smith's direct testimony was largely consistent with his report. However, the Government cross-examined Dr. Smith on several aspects related to the evidentiary and supporting basis for portions of the report and some of Dr. Smith's conclusions, and elicited testimony that gives the Court considerable pause as to the reliability of some (but not all) of those testimonial conclusions. From the balance of the expert report, medical records, testimony and examination of the witness, and other evidence, the Court credits the following in reaching its conclusion.

### *Medical Conditions*

First, while the Court finds Dr. Smith's report and testimony were perhaps excessively broad and overly confident as far as its more expansive conclusions about the current science on COVID-19, the Court does credit his assessment of the Defendant's medical history insofar as it demonstrates the conditions from which the Defendant suffers. The Court finds that those assessments and opinions are based upon Dr. Smith's professional experience, training, and education as a medical doctor and his experience deploying with USAID to Liberia in response to the Ebola epidemic. (*See* ECF No. 586-2, at 2.) His latter experience particularly lends itself to Dr. Smith's assessment of certain medical records stemming from the Defendant's time in Uganda. Dr. Smith testified that he reviewed a clinical assessment of the Defendant in Uganda dating from August of 2015 by Dr. Alex Kakoraki. Dr. Smith testified, based on his experience working with medical professionals in Africa, that medical doctors in countries such as Uganda are well educated

but are often unable to easily access the wide array of medical tests that are available to doctors and patients in the United States. He testified it is typical that the only available records are clinical assessments of the kind which he reviewed in this case.

The Court credits Dr. Smith's report and testimony in establishing that the Defendant has a history of significant respiratory ailments, based on his review of the Defendant's clinical assessment from Uganda. The assessment, which was used as a demonstrative at the hearing, states in relevant part that the Defendant "has been treated several times as a case of Acute Respiratory Tract Infection which has become chronic, . . . Broncho-pneumonia, [and] tracheitis." (Gov't Ex. 8.) The Government did not challenge the credibility or validity of the clinical assessment, but it did argue that Dr. Smith's assessment of the Defendant's respiratory issues is incomplete because he did not review a radiology report by another doctor in Uganda, which was based on an x-ray examination the Defendant received on or around November 19, 2015. (Gov't Ex. 10.) But in the Court's estimation, the radiology report that is in the record here is not inconsistent with the Defendant's clinical assessment. The report concludes, "[f]eatures are compatible with non-specific pneumonitis." (*Id.*) The Government retorts that, according to its understanding, the two medical records are not completely consistent in that the clinical assessment provides a more severe diagnosis than what is reflected in the radiology report. However, the Government did not provide any medical basis for that conclusion. The Court credits Dr. Smith's testimonial opinion that the Defendant has a history of bronchial pneumonia, and all that would come with that history and diagnosis. Further, the Court credits Dr. Smith's concluding testimonial opinion that the Defendant's history as to respiratory conditions enhances the likelihood of his contracting COVID-19 and of an enhanced severity (including the likelihood of intensive care unit

hospitalization/ventilator status) if so acquired. That opinion is well within the scope of Dr. Smith's expertise and experience, and was not undercut or impeached on cross-examination.

The Court also credits Dr. Smith's assessment that the Defendant has hypothyroidism, specifically Hashimoto's thyroiditis, which was not under control as of May of this year. In reviewing the Defendant' BOP medical records, Dr. Smith noted that the Defendant's blood tests as of May 2020 show elevated levels of thyroid-stimulating hormone (TSH), which, according to Dr. Smith, were outside the normal range for the Defendant. (*See* ECF No. 586-1, at 6.) The cause of the Defendant's elevated TSH, in Dr. Smith's estimation, was that he was receiving a sub-therapeutic dosage of levothyroxine—in lay terms, that the dosage that the Defendant was taking was insufficient to do the job. The potential causes of the sub-therapeutic dosage, which were discussed at length in the hearing, appear to be either a miscommunication between the Defendant and the BOP medical staff, or a misunderstanding of the dosage by the Defendant, or his noncompliance with the new dosage. The record here does not point in a specific direction as to that answer.

In the Defendant's most recent recorded clinical assessment dated May 2, 2020, the BOP records state that the Defendant had been under the misimpression that the right dose was half of one pill. (*Id.* at 2.) However, that dosage was upped in February of this year and he was then advised of that fact. (*Id.*) The Court, and for that matter the parties and Dr. Smith, are unsure of what the Defendant's current status is with respect to his hypothyroidism and TSH levels, even presuming that his dosage levels have been adjusted since the incorrect dosage came to light. When the Court asked Dr. Smith whether the Defendant's TSH levels would be within normal range if his dosage were corrected, Dr. Smith was equivocal. And perhaps that was the only response he could provide, given the lack of information regarding the Defendant's exact new dosage and other

data points upon which a competent medical professional would rely to come to that conclusion. Thus, the Court is left at somewhat of a loss as to the Defendant's hypothyroidism in the sense that the Defendant's dosage was presumably corrected some three (3) months ago, but there are no medical records or any other evidence from which the Court can conclude his TSH levels are or are not now under pharmacological control and his condition has improved. However, the disagreement among the parties appeared to be over the magnitude of the Defendant's hypothyroidism if he takes the correct dosage of his medicine and there is no lack of consensus that the Defendant has hypothyroidism.

Lastly, the Court credits the BOP medical records and Dr. Smith's assessment that the Defendant has prior exposure to hepatitis B. The Defendant's BOP medical records indicate that he has "prior exposure to hepatitis B." (*Id.* at 16.) That much is undisputed. Dr. Smith testified, consistent with his medical training, education, and experience, that hepatitis B is like certain other chronic viral infections in that the disease never goes away. In that way, hepatitis B is similar to, in Dr. Smith's words, the human immunodeficiency virus (HIV). However, beyond this, the picture of the Defendant's hepatitis B is hazier. The Government cross-examined Dr. Smith for quite some time on his assessment of the Defendant's hepatitis B, which elicited that there is little to no evidence that the Defendant's hepatitis B is symptomatic. Dr. Smith stated that one potential symptom in the BOP medical records is the Defendant's complaints of "weakness," but admitted that such weakness could be caused by other things in the record. Ultimately, the most the Court could draw from the testimony was that the BOP did not conduct any medical testing which would indicate that the Defendant's hepatitis is or is not under control or in need of pharmaceutical or some other medical intervention. That is in contrast with the Defendant's hypothyroidism, for

which the record points to blood test results that indicate that this condition was not under control as of May 2020.

### Complications Stemming from Defendant's Medical Conditions

Much of Dr. Smith's testimony was dedicated to the issue of whether these three medical conditions present a heightened risk of the Defendant being afflicted with COVID-19 or a higher risk of death or complications from COVID-19 were he to be so afflicted. The question the Court must answer is, presuming the Defendant suffers from a history of respiratory disease, hypothyroidism, and hepatitis B, how does the Court quantify his risk of getting the COVID-19 virus and, if he does get it, of death or serious complications? And, do those risks ultimately cause his medical conditions to rise to the "extraordinary and compelling" level?

As alluded to earlier, parts of Dr. Smith's testimony and his report appear to be overstated. More specifically, Dr. Smith made several statements that were unsupported. For instance, at one point in the testimony the Government asked Dr. Smith whether he disagreed with the conclusions of the Centers for Disease Control and Prevention ("CDC") and certain disease-specific medical associations, who have published statements as to the COVID-19 risk to certain medically vulnerable populations. Dr. Smith dismissed those publications as "political" and often false. Yet he never explained why that was the case either generally or as applicable here, nor did he explain specifically why the particular specialized medical publications that the Government proffered as to thyroid issues, (*see e.g.*, Gov't Exs. 5 and 6), should not be considered by the Court. As such, the Court does not credit that specific, somewhat conclusory and dismissive testimony and will, consistent with a number of other courts in this circuit, *see e.g. United States v. Armstrong*, No. 1:11-CR-89, --- F. Supp. 3d ----, 2020 WL 4226520, at *4 (M.D. Pa. July 23, 2020); *United States v. Polley*, No. CR 18-196, 2020 WL 3574373, at *2 (E.D. Pa. June 30, 2020); *United States v.*

*Rodriguez*, No. CR 17-618, --- F. Supp. 3d ----, 2020 WL 3447777, at *3 (E.D. Pa. June 24, 2020);

*United States v. Cantatore*, No. CR 16-0189 (ES), 2020 WL 2611536, at *4 (D.N.J. May 21, 2020);

*United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, --- F. Supp. 3d ----, 2020 WL 1627331, at

*7 n.16 (E.D. Pa. Apr. 1, 2020); consider the publications by the CDC and other relevant, reputable

medical associations proffered by the Government. (*See* Gov't Exs. 4, 5, 6, 7)

In another instance, Dr. Smith appeared to conflate the impact of hypo- and

hyperthyroidism when analyzing a study that undergirded his expert report. That study reported

that "thyroid disease," which could include *hypo*thyroidism, *hyper*thyroidism, thyroid cancer, and

other conditions, is correlated with poorer outcomes from COVID-19 infection. However, Dr.

Smith never explained how the medical ramifications are the same no matter which thyroid

condition a person has, particularly when *hypo-* and *hyper*thyroidism are at opposite poles. For

these reasons, the Court does not credit the balance of Dr. Smith's report or testimony as far as it

painted in broad strokes the risks of COVID-19 complications arising from the thyroid conditions

that the Defendant presents.[4]

---

[4] At several points in his testimony, the strength of Dr. Smith's conclusions as to the impact of the Defendant's thyroid and hepatitis B conditions did not seem to square with his own assessments of the underlying evidence. For instance, Dr. Smith pointed out that the science surrounding COVID-19 and the risks it poses to people with certain underlying conditions is uncertain. He noted repeatedly that the studies upon which he relied evidenced a correlation, not medical causation, between the Defendant's conditions and COVID-19 complications. Further, he stated on other occasions that when a scientific report uses broad diagnostic language, the report's conclusions are necessarily inclusive of all specific subsets of those diagnoses. As discussed above, he testified that a report, which only referred to "thyroid disease" as a COVID-19 risk factor, indicated a significant likelihood that the Defendant's *hypothyroidism* is a COVID-19 risk factor, even though he admitted that "thyroid disease" is a general term that, for the purposes of the study, may or may not have included both hypothyroidism or hyperthyroidism. Dr. Smith seemed to recognize these shortcomings in his testimony, but they did not appear to temper his conclusions.

The Government and Dr. Smith engaged in repeated back-and-forths on these issues. Those exchanges, in the Court's opinion, were like ships in the night in that they encountered each other at the same factual premises, but then continued on, arriving at vastly different conclusions. It is worth noting that Dr. Smith and the Government both exercised thoughtful consideration in these regards. Nonetheless, the Government and Dr. Smith seemed to speak different languages, which may be at the root of the rhetorical mismatch between the two. One logical explanation for that fact is the reality that medical doctors must in some sense be both overinclusive and extra-cautious in their assessments. Perhaps for that reason, Dr. Smith testified that even though certain of the Defendant's conditions are not listed on the CDC's website relative to COVID-19 risks, *see* Ctrs. for Disease Control & Prevention, *People of Any Age with Underlying Medical Conditions* (last reviewed Aug. 5, 2020), https://www.cdc.gov/coronavirus/2019-

However, the Court does credit Dr. Smith's assessment of the complications that can result from the conditions which the Defendant has. First, Dr. Smith testified that COVID-19 has a significant pulmonary impact, a conclusion that was not challenged, and that those who have had recurrent pulmonary infections, like the Defendant's "chronic" acute respiratory infection and bronchopneumonia, are more likely to contract respiratory infections in the future, and that there is a demonstrably heightened risk of increased severity if so acquired. Second, Dr. Smith testified that those with hypothyroidism who are not getting enough hormones, like the Defendant's sub-therapeutic dosage of levothyroxine, can have a less-functional immune system and an increased risk of infection.

***Medical Conclusions***

In consideration of the papers, oral argument, and testimony discussed above, under the "non-terminal illness" category in § 1B1.13 the Court finds that the Defendant's current conditions—when considered in combination with the ongoing COVID-19 pandemic—rise to an "extraordinary and compelling" level based principally on the risks generated by the Defendant's pulmonary history in combination with the conditions in which he is currently held, and would soon be held at the RRC. Under the Sentencing Commission's Policy Statement, a defendant's non-terminal medical condition may constitute an extraordinary and compelling reason if "a

---

ncov/need-extra-precautions/people-with-medical-conditions.html., that does not mean his conditions do not pose any risk. That is, he essentially argued that "evidence of absence is not an absence of evidence" with respect to what is enumerated on the CDC's list of higher-risk conditions.

While the Court credits Dr. Smith in regard to the general tenor of his medical testimony as to the Defendant's historic and current medical conditions as may be gleaned from his BOP and prior medical records combined with Dr. Smith's overall medical training and experience, Dr. Smith's treatment of some of the evidence and references he relied upon, at least as to the Defendant's thyroid and hepatitis B conditions, was too malleable for purposes of the Court making the necessary findings supportive of compassionate release. And as noted above, perhaps due to the recency of the COVID-19 outbreak, some of the connections that Dr. Smith made between a given medical condition and a negative COVID-19 outcome were purely ones of correlation, not causation, which is far more tenuous medical testimony when offered to ask the Court to find "extraordinary and compelling" circumstances, a burden that the Defendant carries. For that reason, the Court relies on Dr. Smith's core expert opinions as a medical doctor as they relate to the conditions the Defendant had and presently has and the known complications that can result from those conditions.

defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.(1)(A)(ii).

The available medical records and Dr. Smith's report and testimony support that the Defendant's hypothyroidism may not be under control, as evidenced by the TSH levels in his most recently-reported blood tests. But those same records reveal that the Defendant's dosage had been adjusted in the past, that such adjusted dosage if actually used by the Defendant may well have ameliorated his thyroid condition, and at the time of the most recent reported test results, the Defendant had been reminded of what would be the correct effective dosage. And Dr. Smith's conclusion that this hypothyroidism poses a risk of reduced immune system function and higher risk of infection is supported even by the evidence the Government presented at the hearing. (*See* Gov't Ex. 5.) However, there appears to be a general consensus that, notwithstanding those risks, hyperthyroidism alone is not currently known to be a specific risk factor for COVID-19 complications. American Thyroid Association, *Novel Coronavirus (COVID-19) and the Thyroid* (last reviewed Aug. 5, 2020), https://www.thyroid.org/covid-19/coronavirus-frequently-asked-questions/; American Ass'n of Clinical Endocrinologists, *AACE Position Statement: Coronavirus (COVID-19) and People with Thyroid Disease*, (dated Apr. 5, 2020), https://www.aace.com/recent-news-and-updates/aace-position-statement-coronavirus-covid-19-and-people-thyroid-disease. Further, even though the CDC lists "weakened immune system" as a risk factor, that factor is related to "blood, bone marrow, or organ transplant; HIV; use of corticosteroids; or use of other immune weakening medicines." Ctrs. for Disease Control & Prevention, *People of Any Age with Underlying Medical Conditions* (last reviewed Aug. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

conditions.html. And there is reason to credit the Government's argument that the autoimmune nature of the Defendant's hypothyroidism differs from the "weakened immune system" that the CDC lists as a risk factor. American Thyroid Association, *Novel Coronavirus (COVID-19) and the Thyroid* (last reviewed Aug. 18, 2020), https://www.thyroid.org/covid-19/coronavirus-frequently-asked-questions/ ("Immunocompromised people have a weaker immune system and have a harder time fighting infections. However, the immune system is complex, and having autoimmune thyroid disease does not mean that a person is immunocompromised or will be unable to fight off a viral infection."); American Ass'n of Clinical Endocrinologists, *AACE Position Statement: Coronavirus (COVID-19) and People with Thyroid Disease*, (dated Apr. 5, 2020), https://www.aace.com/recent-news-and-updates/aace-position-statement-coronavirus-covid-19-and-people-thyroid-disease ("There is currently no evidence that individuals with autoimmune thyroid disease have an increased risk of COVID-19 infection."); *see also Cantatore*, No. CR 16-0189 (ES), 2020 WL 2611536, at *4 (discussing the AACE position statement).

Dr. Smith's conclusions are purportedly based on the CDC's "Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020." (ECF No. 586, at 6 n.48.) That report—referred to throughout the hearing as the "MMWR"—lists thirty-seven (37) people who had "thyroid disease" in the sample group of COVID-19 patients. As discussed, that term does include hypothyroidism. (Gov't Ex. 1.) Yet we do not know how many of the 37 patients had hypothyroidism as opposed to a different thyroid disease, or even if any of them had it at all. And in any case, the 37 patients represented a small fraction of the overall sample size of 7,162 COVID-19 patients with underling conditions.[5] (*Id.*) Based on the foregoing, in the Court's estimation, the

---

[5] During testimony, Dr. Smith referenced a more recent "MMWR" dated July 17, 2020. The Court looked up that more recent study by the CDC and notes that it does not mention hypothyroidism or even "thyroid disease" at all.

evidence does not lead to the conclusion that the Defendant's hypothyroidism or the impacts of it alone rise to the level of an "extraordinary and compelling reason" for release.

The record evidence also tends to show that the Defendant suffered from a history of respiratory ailments which could lead to chronic respiratory issues, along with a history of hepatitis B exposure. The BOP's medical records do not demonstrate that the Defendant currently or even recently exhibited any symptoms consistent with these conditions. The Defendant's prior respiratory issues in Uganda have not caused any documented issues since 2015. While tests show prior exposure to hepatitis B, the Defendant's records do not show he has symptoms that are clearly caused by hepatitis B. Dr. Smith did not quarrel with those two facts. Instead, he said that the Defendant's previous complaint of "weakness" *could be* a symptom of either condition, but admitted it could have been caused by something else. He rested his analysis on his medical assessment that those with prior bronchopneumonia are more likely to get recurrent lung infections and that hepatitis B sufferers can experience severe complications, such as hepatic decompensation.

The CDC notes that lung conditions like COPD, emphysema, chronic bronchitis, cystic fibrosis, pulmonary fibrosis, and other chronic lung diseases are COVID-19 risk factors. Ctrs. for Disease Control & Prevention, *People of Any Age with Underlying Medical Conditions* (last reviewed Aug. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It is not clear to the Court whether the Defendant's prior lung conditions fall under "other chronic lung conditions." Yet Dr. Smith was unequivocal that the Defendant's risk of respiratory infection, and the resulting severity of such an

---

Jonathan M. Wortham, MD, et al., *Characteristics of Persons Who Died with COVID-19 — United States, February 12–May 18, 2020*, Ctrs. for Disease Control & Prevention (July 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e1.htm?s_cid=mm6928e1_w.

infection, were materially increased based on that disease history, even though the Defendant's clinical assessment is around five (5) years old and no other evidence was presented that the Defendant currently suffers from lung conditions and a review of the Defendant's "pulmonary" exams conducted by the BOP show no current issues. (*See generally* ECF No. 586-1.) But, the bottom line is that the Defendant does present a medical history as to which the credible and credited medical testimony in the record leads to the conclusion that he is at a materially enhanced risk of acquiring a respiratory infection—like COVID-19—and that such an infection would be more severe if so acquired, based on Dr. Smith's medical experience and training, particularly in the infectious disease setting. And the fact that the Defendant's medical history does not show that he has been infected yet, or has suffered from side effects of that prior infection, is both to the Defendant's good fortune and beside the point here. What the record does show is that due to his respiratory disease history, the Defendant's risk of COVID-19 infection and of consequent higher severity is actual and real.

As to the Defendant's hepatitis B condition, the parties agree the Defendant has had prior exposure to hepatitis B, but there is no indication that he is symptomatic or currently suffering from complications that may pose a risk if he contracts COVID-19. The CDC's most recent assessment on the topic is this:

> Currently, we have no information about whether people with hepatitis B or hepatitis C are at increased risk for getting COVID-19 or having severe COVID-19. However, based on available information and clinical expertise, **older adults** and **people of any age who have serious underlying medical conditions**, including people with liver disease, might be at higher risk for severe illness from COVID-19, particularly if the underlying medical conditions are not well controlled.

Ctrs. for Disease Control & Prevention, *What to Know About Liver Disease and COVID-19* (last reviewed Aug. 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/liver-disease.html (emphasis in original). The Defendant has not shown that his hepatitis is "not well controlled" or otherwise poses an extant risk. *Wilson v. United States*, No. 2:11-CR-180 (5), 2020 WL 3315995, at *3 (E.D. Va. June 18, 2020) (denying compassionate release to a defendant with hepatitis B where he did not suffer from any hepatitis-related complications and there was no evidence the defendant's hepatitis was not well-controlled). There is a risk that, because the BOP never followed up on his hepatitis B test, the Defendant could have some hepatitis-related issues that pose a risk. However, the Court has no reason to presume that is the case, given the lack of medical evidence that he is exhibiting symptoms or issues consistent with hepatitis B.[6]

The Court also observes that the conditions surrounding COVID-19 at FCI Jesup are significantly unfavorable. As of the date of this Order, 254 inmates and 21 staff members at FCI Jesup have tested positive for COVID-19, and one inmate has died. *See* Bureau of Prisons, *COVID-19 Cases* (last reviewed Aug. 18, 2020), https://www.bop.gov/coronavirus/. The BOP reports the current inmate population at FCI Jesup to be 1,323 in total, 102 of whom are located in the minimum-security satellite camp, where the Defendant is also housed. FCI Jesup homepage, (last reviewed Aug. 18, 2020), https://www.bop.gov/locations/institutions/jes/. However, of those who tested positive, all of those inmates and three (3) staff members are now listed as "recovered." *See* Bureau of Prisons, *COVID-19 Cases* (last reviewed Aug. 18, 2020), https://www.bop.gov/coronavirus/. However, in light of the still-positive staff members, the Court

---

[6] The Defendant's BOP medical records show that his hepatitis test resulted in a "Positive" result for hepatitis B surface antibody and a "Reactive" result for hepatitis B core antibody total. (ECF No. 586-1, at 85.) His results for hepatitis B surface antigen and hepatitis B core IgM were all "Negative." (*Id.*) Those results appear to show that the Defendant is presently immune to hepatitis B due to natural infection. *See* Ctrs. for Disease Control & Prevention, *Interpretation of Hepatitis B Serologic Test Results*, (last accessed Aug. 5, 2020), https://www.cdc.gov/hepatitis/hbv/pdfs/SerologicChartv8.pdf. This could explain why doctors never followed up on the test. However, without the benefit of expert testimony or argument on this topic, the Court does not consider this observation as a part of its conclusion, but it notes it here for the record.

finds that the risk to the Defendant (and others in custody at FCI Jesup) of contracting COVID-19 during his remaining term of imprisonment is not speculative and is significant in light of the infection history at FCI Jesup. *See United States v. Somerville*, No. 2:12-CR-225-NR, --- F. Supp. 3d ----, 2020 WL 2781585, at *8 (W.D. Pa. May 29, 2020) (citing *United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020)). Coupled with that is the reality that the Defendant is housed in a situation where physical separation and self-care and cleaning are difficult.

Further, it does not appear that his risk of contracting the disease will be any better when he is released to a halfway house. Defense counsel represented at the hearing that the halfway house to which the Defendant would be released in September (the Leidel RRC) is also suffering a COVID-19 outbreak. The Court was not presented with evidence for that assertion, but it was not rebutted by the Government either. However, the BOP lists ten (10) positive cases at the Leidel RRC, where the Defendant would next be headed, and the Court can take notice that it has been publicly reported that the Leidel RRC has seen a recent outbreak of COVID-19. Bureau of Prisons, *COVID-19 Cases* (last reviewed Aug. 18, 2020), https://www.bop.gov/coronavirus/; Liliana Segura, *How the Coronavirus Became a Death Sentence at a Geo Group Halfway House*, The Intercept (July 3, 2020, 7:00 AM), https://theintercept.com/2020/07/03/halfway-house-pandemic-coronavirus-geo-group.

The global COVID-19 outbreak alone, without defendant-specific medical issues actually on the table in a way that is demonstrated to materially and negatively change the COVID-19 risk equation, would not rise to the "extraordinary and compelling" level upon which the Court could act. But there is materially more than that here and, in the Court's judgment, enough to push the Defendant's case over the line. The Defendant has a respiratory history that places him at a higher risk of infection, and a higher risk of greater severity were he infected. And to be sure, COVID-19

plainly impacts respiratory and pulmonary functions. While more equivocal, the Defendant's hypothyroidism and hepatitis B history add to that risk, even if to a more limited degree than Dr. Smith posited. Particularly when placed in the context of the situation at FCI Jesup and the Leidel RRC, the Court concludes that the Defendant's medical condition is sufficient to meet the "extraordinary and compelling" test on this record.

### C. Family Circumstances & Other "Extraordinary and Compelling" Reasons

The Court also considers briefly the Defendant's family circumstances and "other reasons" that he argues justify compassionate release. As discussed, the Defendant states that his family circumstances are "extraordinary and compelling" under the standard in section 1B1.13 of the Sentencing Guidelines.

The details of the Defendant's family situation are recounted in the counseled briefs, as well as exhibits of the Defendant's administrative requests for compassionate release to the Warden at FCI Jesup. (*See* Case No. 16-cr-00133, ECF Nos. 180-4, at 9–10; 180-5, at 1–10.)[7] The Defendant says that wife and daughter—Gabriela and Sarah, respectively—are still in Africa, and that they were "highly dependent" upon him for support up until his arrest. (ECF No. 180-5, at 2.) His arrest and subsequent lack of financial support caused them to move in with an elderly couple when they could no longer pay for living expenses. (*Id.* at 3.) While awaiting trial in the United States after the Defendant's removal to the United States, he says that his parents were occasionally able to obtain work and financially assist Gabriela and Sarah. (*Id.* at 4.) He says Gabriela has been unable to secure work while in Uganda and that "the burden of her welfare and survival falls upon" his shoulders. (*Id.*) He goes on to recount severe hardships and illnesses that Gabriela has faced and the several efforts the Defendant has made to financially support her while he has been on

---

[7] These exhibits were only filed on the case '133 docket. Thus, the ECF docket numbers in this paragraph refer only to case '133. Outside of this paragraph, the docket numbers refer to the earlier case '73.

pretrial detention and incarcerated. (*Id.* at 4−5.) At some point, Gabriela and Sarah separated and the Defendant says he was only sending funds to Gabriela while Sarah was being cared for by Gabriela's sister in the Democratic Republic of the Congo. (*Id.* at 6.) However, the Defendant says that Gabriela's sister has recently stated that she can no longer support Sarah after her husband was hit by a stray bullet. (*Id.* at 9.) So, he says Sarah is trying to make her way back to Uganda to be with her mother, Gabriela. (*Id.*) He admits that neither Gabriela nor her sister (Sarah's putative caregiver) are incapacitated physically. Rather, they are financially incapacitated and unable to care for Sarah. The Defendant says that all of this arises to the "extraordinary and compelling" level.

The Court has no reason to disbelieve the harrowing details of the Defendant's family circumstances, and they do certainly seem extraordinary on their face. Looking again to the Sentencing Guidelines as a useful benchmark, § 1B1.13 provides that "extraordinary and compelling" family circumstances include: "(i) [t]he death or incapacitation of the caregiver of the defendant's minor child or minor children. (ii) [t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13, cmt. n.1(C). The Defendant does not allege that Sarah's caregiver has died. So, the inquiry turns on whether his daughter Sarah's caregiver is incapacitated, under Application Note 1(C)(i), or whether his wife Gabriela is incapacitated, under Application Note 1(C)(ii). In defining "incapacitation," courts have generally looked to the BOP guidelines which address this subject. *United States v. D'Ambrosio*, No. 1:15-CR-3, 2020 WL 4260761, at *3 (M.D. Pa. July 24, 2020); *United States v. Doolittle*, No. CR 19-501 (SRC), 2020 WL 4188160, at *2 (D.N.J. July 21, 2020); *United States v. Marshall*, No. 3:16CR-00004-JHM, 2020 WL 114437, at *3 n.2 (W.D. Ky. Jan. 9, 2020). For "incapacitation" of a spouse, BOP Program

Statement § 5050.50 defines incapacitation as "a serious injury, or a debilitating physical illness and the result of the injury or illness is that the spouse . . . is completely disabled, meaning that the spouse . . . cannot carry on any self-care and is totally confined to a bed or chair." BOP Program Statement § 5050.50. "Incapacitation" could also take the form of "severe cognitive deficit (e.g., Alzheimer's disease or traumatic brain injury that has severely affected the spouse's . . . mental capacity or function)." *Id.* Similarly, BOP Program Statement § 5050.50 defines "incapacitation" of a minor child's caregiver as a "severe injury (e.g., auto accident)" or suffering from a "severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child." *Id.* These definitions are consistent with general understandings of the word. *See Incapacitation*, Webster's Third New International Dictionary Unabridged (2020) ("state of being incapacitated") (referencing the definition of "incapacity"); *Incapacity*, Webster's Third New International Dictionary Unabridged (2020) ("the quality or state of being incapable: inability, incapability; *especially*: lack of physical or intellectual power or of natural or legal qualification").

Accordingly, the Defendant's claims that his wife and his daughter's caregiver are "financially incapacitated" does not fit that bill. And even if the Court took a more expansive approach to the definition of "incapacitation," the Court would not grant this Motion on those grounds without some supporting evidentiary basis. The Defendant's bare declarations here are not enough.

As for the Defendant's "other reasons" grounds, the Court concludes those reasons alone would be too generalized to rise to the "extraordinary and compelling" level. Because the "other reasons" provision of the Guidelines, U.S.S.G. § 1B1.13, cmt. n.1(D), has not been updated since the First Step Act was enacted, there is a dispute as to whether a court may define what fits into the "other reasons" category, or if that determination should be left to BOP, although there is a

growing and strong consensus that the "other reasons" category applies to petitions in the federal courts also. *See United States v. Jackson,* No. 08-20150-02-JWL, 2020 WL 2812764, at *3 (D. Kan. May 29, 2020); *United States v. Hammond*, No. CR 18-184, 2020 WL 2126783, *4 n.5 (W.D. Pa. May 5, 2020).

However, if this Court were to consider the Defendant's Motion under the "other reasons" category, *United States v. Raia*'s holding limits relief when only general concerns are raised. 954 F.3d 594, 597 (3d Cir. 2020). The Defendant's "other reasons" argument includes the "existence of the virus" and the risk that it will spread, the Defendant's "physical vulnerability to the virus," "the desperate circumstances of his family," and "medical treatment for conditions that had not been heretofore diagnosed." (ECF No. 595, at 12.) All of those "other reasons" have been appropriately and specifically addressed elsewhere in the Court's Opinion or are limited by *Raia*. 954 F.3d at 597 ("the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release"). Having provided insufficient "other reasons," the Defendant's Motion is better considered under the "non-terminal illness" and "family circumstances" categories.

### D.  <u>Sentencing Factors and Danger to Others</u>

Finally, even though the Court finds that "extraordinary and compelling" reasons could warrant release, it must also consider whether release of the Defendant is appropriate in light of the factors set forth in § 3553(a). Specifically, "in considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, --- F. Supp. 3d ----, 2020 WL 1940809, at *10 (W.D.N.Y. Apr. 22, 2020).

The Third Circuit recently affirmed that the determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-cr-38, 2020 WL 3871084, at \*4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, --- F.3d ----, 2020 WL 4281503, at \*2 (3d Cir. June 26, 2020)). That discretion includes the district court's ability to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 2020 WL 4281503, at \*2.

Turning to the § 3553(a) factors, the Court concludes that those factors do not counterbalance the Court's finding of "extraordinary and compelling" circumstances and that granting the Defendant's Motions would not undermine the goals of his original sentence. The principal factors the Court considered are the nature and circumstances of the offenses, as well as the need for the sentence to promote respect for the law, reflect the seriousness of those offenses, deter others from engaging in criminal conduct, and provide just punishment. *See* 18 U.S.C. §§ 3553(a)(1), (2); 3142(g)(1). And, consistent with the ruling of our Court of Appeals, the Court also considered the very short period of FCI custody remaining as a factor counseling in favor of release under the 3553(a) analysis. *Pawlowski*, 2020 WL 4281503, at \*2 ("Because a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of sentencing, the time remaining in that sentence may—along with the circumstances underlying the motion for compassionate release and the need to avoid unwarranted disparities among similarly situated inmates—inform whether immediate release would be consistent with those factors.").

There is no doubt that the Defendant's crimes were significant, as was the need to deter him and others from such conduct. So, the Court will not reduce the Defendant's sentence to time-served, which the Court would find to be at odds with the goals of the Defendant's sentence and

the purposes of sentencing. Rather, as outlined below, the Defendant will be placed on supervised release with a term of home confinement to last for the time remaining on the Defendant's sentence, during which period he would have otherwise spent only a few weeks at FCI Jesup, followed by six (6) months at the Leidel RRC—both BOP facilities with a very high positive COVID-19 case count.

The Court also concludes that the Defendant does not pose any tangible danger to others or the community based on his BOP records and criminal history. For its part, rather than addressing the 3553(a) factors, the Government argues that the Defendant has not carried his burden on this factor. (ECF Nos. 585, at 14–15; 596, at 15.) The Court disagrees. The Defendant's crimes here were nonviolent and his conduct in prison has, by all accounts, been up to par. To that effect, he is currently categorized as a "low risk" according to the BOP's PATTERN risk assessment, with "violent offense" and "history of violence" scores of 0. (ECF No. 594, at 14.) His prior criminal history involves three convictions in 2006 for non-violent crimes relating to attempted theft from a Walmart using a fraudulent check and theft under $100 in a separate incident related to his selling of fraudulent software on eBay. (PSR, ECF No. 552, ¶¶ 39–40.)

The Court thus concludes that the Defendant does not pose any tangible danger to others or the community and that the reduction of the Defendant's sentence to supervised release with home confinement, in addition to all of the other supervised release conditions already in place, is not inconsistent with the goals of the Defendant's sentence or otherwise outweighed by the Court's consideration of the 3553(a) factors. In particular, the Court does not find that release of the Defendant to home confinement just over six (6) months ahead of his release date will negate the original purposes of sentencing or place the community at risk. *See United States v. Early*, No. 09-282, 2020 WL 2112371, at *4 (N.D. Ill. May 4, 2020). The time that the Defendant has spent in

custody has been considerable and serious. Relieving him of the requirement of spending the next (and his last) six and a half months in a prison and RRC will not, in the Court's judgment, undermine the imposed sentence's consideration of the seriousness of the offenses of conviction, nor will it diminish the sentence's deterrent effect. That incremental interval, in the Court's judgment, is simply not material to the overall sentencing equation when considered in the context of the entire record now before the Court. That context covers not only the Defendant's offense conduct and prior record, but also his medical conditions and the high-risk of infection at FCI Jesup and the Leidel RRC. As such, the original goals of sentencing can and will be carried out as the Defendant serves the remainder of his in-custody sentence while on home confinement.

## III.   <u>CONCLUSION</u>

The Court finds and conclude that the Defendant has administratively exhausted his request to the BOP and that his Motions are properly before the Court. Further, the Defendant's medical conditions, in particular his history of respiratory issues, rise to an "extraordinary and compelling" level. The Court has considered the relevant factors set forth in § 3582(c), as well as the applicable policy statements issued by the Sentencing Commission and the factors set forth in § 3553(a), and concludes that the original purposes of sentencing would not be impeded by the Defendant's release to supervised release with the condition of home confinement six and a half months ahead of schedule. That sentence, in the Court's estimation, will remain one that is sufficient but not greater than necessary to fulfill the purposes of sentencing under applicable law. Accordingly, the Defendant's Motions to Reduce Sentence at ECF No. 574 in case '73 and at ECF No. 162 in case '133 are GRANTED in that the remainder of the Defendant's in-custody sentence will be converted to a term of supervised release with the condition of home confinement, followed by the

term of supervised release imposed as part of his original sentence, each with all of the conditions

of supervised release imposed at the time of sentencing.


                                    s/ Mark R. Hornak
                                    Mark R. Hornak
                                    Chief United States District Judge


cc:     All counsel of record